***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Donovan and the briefs and oral argument before the Full Commission. The appealing party has shown good grounds to reconsider the evidence and, upon reconsideration, the Full Commission reverses the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as a matter of law the following, which were entered into by the parties as: *Page 2 
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. Defendant Chesterfield Services, Inc. was the carrier on the risk.
3. The employee-employer relationship existed between the parties at all relevant times.
4. Plaintiff's average weekly wage and compensation rate is to be confirmed by Form 22 and other evidence, if deemed appropriate.
5. The issues for determination are:
 a. Whether plaintiff suffered a compensable injury by accident on July 19, 2004 while employed by defendant?
 b. To what, if any, compensation is plaintiff entitled as a result of the July 19, 2004 alleged injury by accident?
 c. What is plaintiff's appropriate average weekly wage?
 EXHIBITS
1. The parties entered the following into the evidence of records at the hearing before the Deputy Commissioner:
 a. Stipulated Exhibit #1: I.C. Forms, discovery, payroll records, recorded statement
 b. Stipulated Exhibit #2: Medical records
 c. Defendants' Exhibit #1: Surveillance report
 d. Defendants' Exhibit #2: DVD of surveillance *Page 3 
 e. Defendants' Exhibit #3: DVD of Surveillance
 f. Defendants' Deposition Exhibit #1: Medical records, attached to the deposition of Dr. Stranges.
 *********** EVIDENTIARY RULING
Evidence was presented that the private investigator conducting surveillance of plaintiff on May 30 and 31, 2006, had a verbal conversation with plaintiff at the start of the investigation. The circumstances of the interaction were as follows: The investigator was given plaintiff's name and discovered that he was working at a driving range. The investigator was not aware that plaintiff was represented at this time. In an attempt to identify plaintiff upon arriving at the driving range, the investigator approached a man unknown to him and asked if he knew plaintiff.
Plaintiff identified himself and initiated a conversation with the investigator. The substance of the conversation involved where the investigator was from, where he was staying, the prices at the driving range and other items unrelated to the instant case. It is noted that the evidence shows that plaintiff was the primary instigator of the continuing conversation and at no time did the investigator ask any questions designed to elicit information pertinent to plaintiff's claim.
The duration of the conversation was approximately 20 minutes. When the investigator provided his report to defense counsel, he was immediately advised of plaintiff's representation and no further verbal contact with plaintiff occurred. Surveillance continued on June 17 and 18, 2006. Plaintiff seeks to have the video surveillance, the surveillance report and the investigator's testimony excluded from the record on grounds that the contact was both unlawful and unethical based upon prior knowledge of plaintiff's representation by counsel, pursuant to the Rules of *Page 4 
Professional Conduct # 4.2, Salaam v. N.C. Dept. of Transportation,122 N.C. App. 83, 468 S.E.2d 536 (1996), disc, review improvidentlyallowed, 345 N.C. 494, 480 S.E.2d 51 (1997), and Terry v. PPG Industries,Inc., 156 N.C. App. 512, 577 S.E.2d 326 (2003).
The Full Commission finds no merit in plaintiff's arguments. It is noted in the evidence that a chance conversation took place between the plaintiff and the Investigator, and that upon learning of the representation, held no further conversations with plaintiff. Beyond the initial question regarding plaintiff's identity, the continuing conversation in question was carried on by plaintiff. Nothing of substance involving this case was discussed and nothing that was said has been used in any way in an attempt to influence the outcome of this claim. Further, the substance of the actual surveillance that is plaintiff's performance of certain work tasks at the driving range, has been completely corroborated by plaintiff in his own testimony. It is also noted that the holdings in both Salaam and Terry are specific to exparte conversations with a treating physician and are based in large part upon a patient's right to privacy. The Full Commission finds that these cases are not applicable to the issues raised in plaintiff's motion.
Based upon the lack of actual violation of ethical or legal standards, along with the lack of harm or prejudice suffered by plaintiff as a result, plaintiff's Motion to Exclude evidence is hereby DENIED. The Full Commission finds that the exhibits in question are properly admitted into the Record.
 ***********
Based upon all the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was forty-two (42) years old at the time of the hearing before the Deputy *Page 5 
Commissioner. Plaintiff has an approximate twenty (20) year history of drug addictions and alcoholism, as a result of which he has had long-term treatment for depression.
2. Plaintiff's job history consists primarily of working in construction. In 2003, plaintiff was employed by defendant-employer in Annandale, Virginia. During this time, plaintiff was under the supervision and guidance of Major James Hipp, the spiritual leader of defendant-employer in Annandale. Also in 2003, Major Hipp assisted plaintiff in relocating to Asheville, North Carolina, to participate in a residential substance abuse and addiction program provided by the Western Carolina Mission.
3. Once in Asheville, plaintiff was provided with room and board, including a single room with bath and meals at a cost to plaintiff of $50.00 per week. Plaintiff was not employed by defendant-employer at the time he was given the room.
4. In late 2003, plaintiff was given a job as a bell-ringer for defendant-employer during the holiday season. In January 2004, he began working for defendant-employer as a custodian, earning $7.25 per hour. After a few months as a custodian, plaintiff was given a position as a thrift store manager for defendant-employer, initially earning $7.75 per hour, and then later $8.10 per hour.
5. Plaintiff's duties as a thrift store manager included loading and unloading donations, keeping merchandise stocked and rotated, supervising other workers, maintenance and cleaning of the store. Major Travis Israel, plaintiff's supervisor, rated the job as "physically demanding."
6. In June 2004, plaintiff suffered a relapse of substance abuse. Plaintiff testified that as a result of the relapse, he began to suffer depression and anxiety regarding his job with defendant-employer. *Page 6 
7. On July 19, 2004, plaintiff was helping load a refrigerator on the back of a truck at work when he "felt a slight pain" in his back. Plaintiff did not report the injury since he believed it was only a pulled muscle. Plaintiff tried to "work through" his back pain after his July 19, 2004 injury, although the pain was "nagging" at him. During the next few weeks, plaintiff spent 3 ½ days building an 8 by 8 by 16 foot shed by himself. Plaintiff continued to work for defendant-employer until July 31, 2004 when the combination of physical pain and stress from the back pain created an emotional breakdown.
8. On July 31, 2004, plaintiff presented to Sisters of Mercy Urgent Care with complaints of stress and inability to sleep for approximately two weeks. Plaintiff was diagnosed with anxiety and prescribed Xanax.
9. On August 1, 2004, plaintiff was transported to the Emergency Room of St. Joseph's Hospital. Plaintiff does not remember the circumstances of how he came to arrive at the hospital or what he told the medical personnel since he was intoxicated. The hospital records indicate that plaintiff had been smoking cocaine for the previous two days, that he had taken ten 1-mg Xanax pills over a period of six hours and that he had consumed a twelve-pack of beer that afternoon and evening. Plaintiff does not recall providing any of this history. Plaintiff was transferred to Copestone for psychiatric care.
10. On August 1, 2004, plaintiff was examined by Dr. Anthony Weisenberger. Dr. Weisenberger's notes indicate that plaintiff presented with a blood alcohol level of 0.14 and that plaintiff stated that he had experienced racing thoughts and was hyperactive for the last month or so, becoming irritable and agitated. Plaintiff was also experiencing depression as a result of his relapse. Plaintiff complained of constant low back pain with radiation down the left leg and foot. A history taken by nurse practitioner Nora Mae Wisham indicated a two-week history of low *Page 7 
back pain with radiculopathy.
11. On August 2, 2004, x-rays of the lumbar spine show no obvious abnormality and minor degenerative lipping.
12. On August 3, 2004, plaintiff underwent an MRI scan of the lumbar spine which showed diffuse annular bulging at L4-5 with bilateral foraminal stenosis and a minute right paracentral disc protrusion at L5-S1 without thecal sac or nerve root contact or deformity.
13. On August 4, 2004, plaintiff was examined by neurosurgeon Dr. Steven Stranges. Dr. Stranges noted that plaintiff presented with an approximately three week history of low back and left leg pain, which began when he was lifting a couch for the Salvation Army. While Dr. Stranges opined that the MRI did not identify a neural compressive source for plaintiff's pain, he testified that plaintiff's pain complaints were consistent with those patients who had picked up heavy objects and that back pain has no predictable patterns of where the symptoms will occur after a lifting injury. A nerve conduction study performed on August 6, 2004 indicated no evidence of peripheral neuropathy, plexopathy or radiculopathy.
14. Plaintiff was released from the hospital on August 13, 2004. He stayed with Major Hipp until his father came to take him back to Virginia. Plaintiff did not earn any income between the time he left Asheville and June 2005. During this period he did not look for work, but focused on his recovery from substance abuse.
15. On September 9, 2004, plaintiff presented to orthopedist Dr. David L. Durica. Dr. Durica, an orthopaedic surgeon for over thirty-five years, saw plaintiff for minor orthopaedic problems in 1994 that did not result in any restrictions or disability periods. Plaintiff gave a history of developing back pain upon lifting a sofa and then a refrigerator on July 19, 2004. Dr. Durica diagnosed plaintiff with a possible muscle tear in the lumbar-sacral area and a possible *Page 8 
herniated disc at L5-S1. He started plaintiff on a physiotherapy program and made arrangements to obtain plaintiff's medical records from Asheville.
16. Dr. Durica reviewed plaintiff's August 3, 2004 MRI and noted an annular bulging that he described as "small, but nevertheless significant." He recommended surgery to repair the disc, and that plaintiff avoid lifting and bending. On July 27, 2005, Dr. Durica provided plaintiff with the following restrictions: sit no more than 2 hours at one time without breaks, lifting no more than 25 pounds, walk/stand no more than 30 minutes, kneel/squat no more than 30 minutes, no climb more than 2 flights of stairs, and no climb ladders, no twist/bend more than 2/hour, and no overhead use of arms more than 30 minutes and on intermittent basis only. In November 2004, Dr. Durica released plaintiff to return to light duty work.
17. Dr. Durica opined that plaintiff's July 19, 2004 accident caused his ongoing back problems. Dr. Durica based his opinion on plaintiff's medical history, work history, ten year absence of any medical treatment on his back, onset of pain, and the August 3, 2004 MRI findings. Dr. Durica noted that his opinion was "within reasonable medical certainty." When asked how he was certain that plaintiff did not have a pre-existing back condition, Dr. Durica opined that it would be quite unlikely that plaintiff could endure heavy lifting with such an injury without experiencing symptoms. When asked about plaintiff's ability to build the shed following his back injury, Dr. Durica stated that construction work "would be somewhat difficult to do," but plaintiff had displayed a good attitude and work ethic to return to work when he was able to do so.
18. In June 2005, plaintiff began working at a driving range owned by his sister, Ms. Elizabeth Newman. Plaintiff's duties included running the office and cash register, some landscaping, and using a tractor to retrieve golf balls. The position is seasonal, closing each year *Page 9 
in September and reopening on Memorial Day in the Spring. Plaintiff also worked at the driving range in 2006. When not working at the range, plaintiff lived with his family and attended Alcoholics Anonymous (AA) and Narcotics Anonymous (NA) meetings. Plaintiff has not looked for other work due to the number of AA and NA meetings he attends and the bouts of sharp pain he experiences.
19. Plaintiff's employment with his sister was a job that permitted him to work as much as he could. Since plaintiff's back pain and ability to work was uncertain and limited, Ms. Newman was forced to hire substitute workers as a "cushion" for the times that he was unable to work due to physical pain. He did not work regular hours that would be required in a job in the competitive national economy.
20. The Full Commission finds that plaintiff's job with his sister does not represent work that is available in a competitive workplace and does not represent a resumption and/or return of earning capacity to plaintiff.
21. In August 2004, plaintiff started seeing Licensed Clinical Social Worker Barbara Maury through his mother's mental health insurance plan. Ms. Maury is certified through the States of Maryland and Virginia to work as an employee assistance counselor. Ms. Maury testified that plaintiff told her about his July 19, 2004 back injury while moving a refrigerator. Plaintiff described the back pain as severe. Ms. Maury observed difficulties with plaintiff's posture, gait, and emotional stress during his sessions with her.
22. Plaintiff engaged in approximately twenty (20) one-hour counseling sessions with Ms. Maury through April 2005 when his mother's health plan stopped paying for the visits. Ms. Maury opined that plaintiff suffered from depression, which she attributed to chronic pain. Ms. Maury had little knowledge of plaintiff's twenty (20) plus year history of depression or the level *Page 10 
of his substance abuse and had not reviewed any of plaintiff's medical records. However, Ms. Maury opined that plaintiff's current psychological problems and resulting relapse into drugs and alcohol was clearly related to the July 19, 2004 accident. Ms. Maury based her opinion on plaintiff's work history, good work ethic, and pride in his ability to perform physical work, and consistent statements during her counseling sessions with him.
23. Ms. Maury opined that the July 19, 2004 injury by accident exacerbated plaintiff's existing depression and would have impacted his ability to work any job that he was physically or mentally able to perform. She opined that plaintiff's severe depressive state was due to his mental reaction to back pain and resultant inability to perform physical labor.
24. Ms. Maury recommended that plaintiff seek psychiatric help, participate in a long-term Christian based treatment plan, continue to attend AA and NA meetings, and continue taking Seroquel and Relafen for medication.
25. Based on review of the evidence as a whole, the Full Commission finds as fact that plaintiff suffered an injury by accident to his back arising out of and in the course of his employment with defendant-employer on July 19, 2004.
26. Plaintiff has shown that his continuing depression is reasonably and significantly connected to his July 19, 2004 work-related injury. The greater weight of the evidence shows that while plaintiff has battled depression for more than twenty (20) years before the July 19, 2004 accident, he possessed the ability to earn wages and hold down employment with defendant-employer until his accident. The July 19, 2004 injury by accident aggravated plaintiff's pre-existing psychological problems.
27. Dr. Durica treated plaintiff through February 2, 2006, at which time he released plaintiff with the same restrictions he assigned on July 27, 2005. When asked whether plaintiff *Page 11 
could continue even the accommodated work offered by his sister, Elizabeth Newman, Dr. Durica opined that plaintiff should not attempt it since the risk of re-injury and aggravation of pain is "too great."
28. The Full Commission finds that plaintiff had the mental and physical ability to perform his job with defendant-employer on July 19, 2004 and the accident on that date removed his ability to earn wages and handle that employment or any other job in the competitive national economy.
29. The Full Commission finds as fact that room and board were provided to plaintiff based upon his financial need, the room's availability and defendant-employer's desire to assist plaintiff in his recovery from drug and alcohol addiction. The value of the room and board did not comprise a portion of plaintiff's wages, nor was room and board provided in lieu of wages or compensation.
30. Plaintiff's average weekly wage is $306.41, yielding a compensation rate of $204.06.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. On July 19, 2004, plaintiff suffered an injury by accident to his back arising out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. When a pre-existing, non-disabling, non-job related condition is aggravated or accelerated by a compensable workplace accident, such that disability results, the employer must compensate the employee for the entire resulting disability even though it would not have *Page 12 
disabled a normal person to that extent. Morrison v. BurlingtonIndustries, 304 N.C. 1, 282 S.E.2d 458 (1981). This is true even where the injury exacerbates a pre-existing psychiatric condition. Toler v.Black and Decker, 134 N.C. App. 695, 518 S.E.2d 547 (1999); see alsoCalloway v. Memorial Mission Hospital, 137 N.C. App. 480,528 S. E. 2d 397 (2000). The competent evidence supports a finding that plaintiff's pre-existing psychological condition was aggravated or accelerated by the July 19, 2004 work accident.
3. Plaintiff has the burden of proving disability, defined as a loss of wage earning capacity. Russell v. Lowes Product Distribution,108 N.C. App. 762, 425 S.E.2d 454 (1993). In order to meet the burden of proving disability, plaintiff must prove that he was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury. Hilliard v. Apex Cabinet Co., 305 N.C. 593,290 S.E.2d 682 (1982). An employee may meet the initial burden of production by producing one of the following: (1) medical evidence that she is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that she is capable of some work, but that he has, after a reasonable effort, been unsuccessful in his efforts to obtain employment; (3) evidence that she is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that she has obtained other employment at wages less than her pre-injury wages. Demery v. Perdue Farms, Inc.,143 N.C. App. 259, 545 S.E.2d 485 (2001); Russell v. Lowes ProductDistribution, supra. In this case, plaintiff has established that he is physically and mentally unable to work due to his compensable injuries.
4. As a consequence of the July 19, 2004 injury by accident, plaintiff has been unable to earn wages in the same or other employment from July 19, 2004 and continuing. *Page 13 
Defendants are responsible for paying plaintiff temporary total disability compensation at the rate of $204.06 per week from July 19, 2004 and continuing until further order of the Commission. N.C. Gen. Stat. § 97-29.
5. Defendants shall be entitled to a credit for any and all salary paid to plaintiff by his sister for the accommodated work he performed for her. N.C. Gen. Stat. § 97-42.
6. As a consequence of the injury by accident, plaintiff will require further medical treatment for his back. Additionally, plaintiff will require ongoing psychological treatment. Such treatment as recommended by Dr. Durica and Ms. Maury is reasonably necessary. Defendants are responsible for payment of all past and other necessary medical and psychological treatment as recommended by Dr. Durica and Ms. Maury. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
7. Plaintiff's average weekly wage calculation does not include room and board that was provided based on financial need. Plaintiff's average weekly wage is $306.41, yielding a compensation rate of $204.06. N.C. Gen. Stat. § 97-2(5).
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission makes the following:
 AWARD
1. Subject to a reasonable attorney's fee herein approved, defendants shall pay to plaintiff compensation for temporary total disability compensation at the rate of $204.06 per week from July 19, 2004 and continuing until further order of the Commission. All accrued benefits shall be paid in a lump sum.
2. Defendant-employer is entitled to a credit for all income plaintiff has received *Page 14 
from his work with his sister on a week to week basis.
3. Defendants shall pay all medical expenses incurred or to be incurred as a result of plaintiff's compensable injuries as long as the same is reasonably designed to effect a cure, provide relief or lessen the plaintiff's period of disability. This includes treatment provided by Dr. Durica and Ms. Maury.
4. An award of twenty-five percent (25%) of the compensation due plaintiff under paragraph 1 is approved for plaintiff's counsel and shall be deducted from the compensation due plaintiff and paid directly to plaintiff's counsel. Thereafter, every fourth check shall be made payable and forwarded to plaintiff's counsel.
5. Defendants shall pay the costs of this action.
This the 11 th day of June, 2008.
 S/___________________
 DANNY LEE McDONALD
 COMMISSIONER
CONCURRING:
S/_____________ DIANNE C. SELLERS COMMISSIONER
S/_____________ CHRISTOPHER SCOTT COMMISSIONER *Page 1